**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| **AMBER R. WOODSON**, **ANTHONY BRYANT**, **AUSTIN POOL**,  **MARC CULPEPPER**, and **MARCUS ISSAC**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**ORACLE CORPORATION**, **COX ENTERPRISES, INC.**, **EMERSON ELECTRIC CO.**, and **WP COMPANY** d/b/a **THE WASHINGTON POST**,<br><br>Defendants. | Case No. 1:25-cv-01902<br><br><br><br><br><br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs Amber R. Woodson, Anthony Bryant, Austin Pool, Marc Culpepper, and Marcus Issac ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Oracle Corporation ("Oracle"), Cox Enterprises, Inc. ("Cox"), Emerson Electric Co. ("Emerson"), and WP Company d/b/a The Washington Post ("Washington Post") (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      This class action arises from Defendants' failure to protect highly sensitive data.

2.      Defendant Oracle is a multinational technology and enterprise software firm based in Austin, Texas.[1]

3.      Defendant Cox is a global communications and automotive services company based in Atlanta, Georgia.[2] On information and belief, Defendant Cox is an enterprise client of Oracle.[3]

4.      Defendant Emerson is a global technology, software, and engineering company based in Saint Louis, Missouri.[4] On information and belief, Defendant Emerson is an enterprise client of Oracle.[5]

5.      Defendant Washington Post is a major American newspaper and digital media company based in Washington D.C.[6] On information and belief, Defendant Washington Post is an enterprise client of Oracle.[7]

---

[1] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Nov. 18, 2025).

[2] *Businesses*, COX, https://www.coxenterprises.com/businesses (last visited Nov. 18, 2025).

[3] *Cl0P ransomware gang names 29 Oracle EBS breach victims*, PAUBOX, https://www.paubox.com/blog/cl0p-ransomware-gang-names-29-oracle-ebs-breach-victims (last visited Nov. 18, 2025).

[4] *Contact Us*, Emerson, https://www.emerson.com/en-us/contact-us?r=500&p=1 (last visited Nov. 18, 2025).

[5] *Data Breaches*, SECURITYWEEK, https://www.securityweek.com/industrial-giants-schneider-electric-and-emerson-named-as-victims-of-oracle-hack/ (last visited Nov. 18, 2025).

[6] *About The Post*, The Washington Post, https://www.washingtonpost.com/about-the-post/ (last visited Nov. 19, 2025).

[7] *Washington Post confirms data on nearly 10,000 people stolen from its Oracle environment*, CYBERSCOOP, https://cyberscoop.com/washington-post-oracle-clop-attacks/ (last visited Nov. 19, 2025).

6.      As such, Oracle stores a litany of highly sensitive personal identifiable information ("PII") about the current and former employees and/or customers of Defendants Cox, Emerson, and Washington Post.

7.      But such PII was inadequately protected and thus exposed to cybercriminals in a data breach (the "Data Breach").

8.      It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to their current and former employees' PII.

9.      On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

10.     Plaintiffs are Data Breach victims. They bring this class action on behalf of themselves, and all others harmed by Defendants' misconduct.

11.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, their current and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

12.     Plaintiff, Amber R. Woodson, is a natural person and a citizen of Oklahoma. She is domiciled in Oklahoma (where she intends to remain).

13.    Plaintiff, Austin Pool, is a natural person and a citizen of Texas. He is domiciled in Texas (where he intends to remain).

14.    Plaintiff, Anthony Bryant, is a natural person and a citizen of Virginia. He is domiciled in Virginia (where he intends to remain).

15.    Plaintiff, Marc Culpepper, is a natural person and a citizen of Texas. He is domiciled in Texas (where he intends to remain).

16.    Plaintiff, Marcus Issac, is a natural person and a citizen of Texas. He is domiciled in Texas (where he intends to remain).

17.    Defendant, Oracle Corporation, is a stock corporation incorporated in Delaware and with its principal place of business at 2300 Oracle Way, Austin, Texas, 78741. The registered agent for service of process is Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

18.    Defendant Cox Enterprises, Inc. is a corporation incorporated in Delaware and with its principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, Georgia, 30328. Its Registered Agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

19.    Defendant Emerson Electric Co. is a corporation incorporated in Missouri with its principal place of business at 8027 Forsyth Blvd. Saint Louis, Missouri, 63105. Its Registered Agent for service of process is Michael Tang, 8027 Forsyth Blvd., Saint Louis, MO 63105-1706.

20.    Defendant WP Company d/b/a The Washington Post is a corporation incorporated in Delaware with its principal place of business at 1301 K Street NW Washington, District of Columbia, 20071. Its Registered Agent for service of process is C T Corporation System, 1015 15th St NW, Suite 1000, Washington, D.C. 20005.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one Plaintiff is a citizen of a different state than at least one Defendant. And there are over 100 putative Class Members. Defendant Oracle Corporation is a citizen of Texas.

22.     This Court has personal jurisdiction over Defendants because Oracle Corporation is headquartered and has its principal place of business in the Austin Division of the Western District of Texas and Defendants regularly conduct business in Texas and have sufficient minimum contacts in Texas. It is a citizen of Texas. Moreover, Defendants Cox, Emerson, and Washington Post have sufficient contacts with Texas through their business operations and contacts with Oracle—including whereby Defendants Cox, Emerson, and Washington Post sent the PII of Plaintiffs and Class Members to Oracle in Texas.

23.     Venue is proper in the Austin Division of the Western District of Texas because Oracle's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. Moreover, Defendants Cox, Emerson, and Washington Post have sufficient contacts with this District through their business operations and contacts with Oracle—including whereby Defendants Cox, Emerson, and Washington Post sent the PII of Plaintiffs and Class Members to Oracle which has its principal office in this District.

## BACKGROUND

***Defendants Collected and Stored the PII of Plaintiffs and the Class***

24.    Defendant Oracle is a multinational technology and enterprise software firm.[8]

25.    Defendant Cox is a global communications and automotive services company.[9]

26.    Defendant Emerson is a global technology, software, and engineering company.[10]

27.    Defendant Washington Post is a major American newspaper and digital media company based in Washington D.C. and on information and belief has subscribers in the Austin Division of the Western District of Texas.[11]

28.    On information and belief, Defendants Cox, Emerson, and Washington Post are enterprise clients of Defendant Oracle.

29.    As part of their business, Defendants Cox, Emerson, and Washington Post collect and maintain the PII of thousands of their current and former employees and/or clients.

30.    As part of their businesses, Defendants Cox, Emerson, and Washington Post then send such PII to Defendant Oracle.

31.    As part of its business, Defendant Oracle collects and maintains the PII of the current and former employees and/or clients of Defendants Cox, Emerson, and Washington Post.

32.    In collecting and maintaining the PII, Defendants agreed they would safeguard the data in accordance with their internal policies, state law, and federal law. Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

---

[8] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Nov. 10, 2025).
[9] *Businesses*, COX, https://www.coxenterprises.com/businesses (last visited Nov. 18, 2025).
[10] *Contact Us*, Emerson, https://www.emerson.com/en-us/contact-us?r=500&p=1 (last visited Nov. 18, 2025).
[11] *About The Post*, The Washington Post, https://www.washingtonpost.com/about-the-post/ (last visited Nov. 19, 2025).

33.    Under state and federal law, businesses like Defendants have duties to protect current and former employees' PII and to notify them about breaches.

34.    Defendant Oracle recognizes these duties, advertising in its "Privacy Policies" that:

a.    "Oracle has implemented and will maintain technical and organizational measures designed to prevent accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Services Personal Information. These measures, which are generally aligned with the ISO/IEC 27001:2013 standard, govern all areas of security applicable to the Services, including physical access, system access, data access, transmission, input, security oversight, and enforcement."[12]

b.    "Oracle employees are required to maintain the confidentiality of personal information. Employees' obligations include written confidentiality agreements, regular training on information protection, and compliance with company policies concerning protection of confidential information."[13]

c.    "We do not share or sell personal information subject to this Privacy Policy with third parties for any commercial purposes."[14]

d.    "If personal information is transferred to an Oracle recipient in a country that does not provide an adequate level of protection for personal information under applicable data protection law in the country where such

---

[12] *Privacy Policies*, ORACLE, https://www.oracle.com/legal/privacy/customer-data-research-development-privacy-policy/#9 (last visited Nov. 19, 2025).
[13] *Id*.
[14] *Id*.

information was collected, Oracle will take adequate measures designed to protect the personal information, such as ensuring that such transfers are subject to EU Model Clauses or other adequate transfer mechanism as required under relevant data protection laws."[15]

35.    Defendant Cox recognizes these duties, advertising in its "Privacy Policy" that:

a.    "CEI takes reasonable measures to protect CEI-Collected PII (excluding public UGC) from loss, theft, misuse, unauthorized access, disclosure, alteration, and destruction."[16]

b.    "To help protect you and others, CEI and its Service Providers may (but make no commitment to) monitor use of the CEI Sites, and may collect and use related information including CEI-Collected PII to, without limitation, identify fraudulent activities and transactions; prevent abuse of, and investigate and/or seek prosecution for, any potential threats to or misuse of the CEI Sites; ensure compliance with the Terms of Use and this Privacy Policy; investigate violations of or enforce these documents; improve the CEI Sites and your CEI Sites experiences, and to protect the rights and property of CEI, third parties, and other users."[17]

36.    Defendant Emerson recognizes these duties, advertising in its "Privacy Notice" that:

---

[15] *Id.*

[16] *Privacy Policy*, COX ENTERPRISES, https://www.coxenterprises.com/privacy-policy#section1 (last visited Nov. 19, 2025).

[17] *Id.*

a.   "We only share your Personal Data with companies, organizations and individuals outside of Emerson as described below or as described in a Specific Notice."[18]

b.   "Third-party service providers receive your Personal Data as necessary to perform their role, and we instruct them not to use your Personal Data for any other purposes."[19]

c.   "No mobile information will be shared with third parties/affiliates for marketing/promotional purposes. All the above categories exclude text messaging originator opt-in data and consent; this information will not be shared with any third parties."[20]

d.   "We will use or disclose your Personal Data if required or authorized by applicable law as necessary to (without limitation) comply with legal processes or respond to requests from government authorities, enforce our terms and conditions or investigate violations of them, to detect, prevent or address fraud, security or technical issues, or to protect our operations or those of our affiliates, protect the rights and safety of Emerson, its affiliates or individuals."[21]

37.   Defendant Washington Post recognizes these duties, advertising in its "Privacy Policy" that:

---

[18] *Privacy Notice*, EMERSON, https://www.emerson.com/en-us/privacy-notice#Collect (Last visited Nov. 19, 2025)
[19] *Id*.
[20] *Id*.
[21] *Id*.

a. "We use your information if we, in good faith, believe is necessary or appropriate to secure, protect, enforce, or defend the legal rights, privacy, safety, or property of the Services, its employees or agents, or other users, and to comply with applicable law and legal process."[22]

b. "We use your information with your consent or at your direction."[23]

c. "We keep your information to fulfill the purposes described above, unless a longer retention is required or permitted by law. Our retention is based upon the amount, nature and sensitivity of the information, the potential risk of harm from unauthorized use or disclosure of the information, the purposes for which we process the information, applicable legal requirements, and our legitimate interests."[24]

d. "If you opt out of email marketing, we maintain your email on our suppression list for an extended time to honor your opt out. We may delete or de-identify your information sooner if we receive a verifiable deletion request, subject to exemptions under applicable law."[25]

***Defendants' Data Breach, Cl0p, and the Dark Web***

38.    On July 10, 2025, Oracle was hacked in the Data Breach—which compromised the data of its enterprise consumers.[26]

---

[22] *Privacy Policy*, The Washington Post, https://www.washingtonpost.com/privacy-policy/ (Last visited Nov. 19, 2025).
[23] *Id*.
[24] *Id*.
[25] *Id*.
[26] *Data Breach Notification*, MAINE ATTY GEN (Nov. 7, 2025) https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a69e0001-a0f8-46d9-a49d-cb01159afec2.html.

39.    In particular, the notorious cybercriminal syndicate "CL0P" gained access to the PII of Plaintiffs and Class Members.[27]

40.    Specifically, Cl0p "exploited what may be CVE-2025-61882 as a zero-day vulnerability against Oracle EBS customers as early as Aug. 9, 2025 . . . with additional suspicious activity dating back to July 10, 2025" and "the threat actor successfully exfiltrated a significant amount of data from impacted organizations."[28]

41.    Worryingly, Cl0p confirmed that it had obtained PII of Defendants Cox, Emerson, and Washington Post.[29] Screenshots of the Dark Web posts are provided below.[30]

---

[27] *Oracle E-Business Suite Zero-Day Exploited in Widespread Extortion Campaign*, GOOGLE CLOUD (Oct. 9, 2025) https://cloud.google.com/blog/topics/threat-intelligence/oracle-ebusiness-suite-zero-day-exploitation.

[28] *Id*.

[29] Eduard Kovacs, *Nearly 30 Alleged Victims of Oracle EBS Hack Named on Cl0p Ransomware Site*, SECURITY WEEK (Nov. 10, 2025, 6:46 AM ET) https://www.securityweek.com/nearly-30-alleged-victims-of-oracle-ebs-hack-named-on-cl0p-ransomware-site/.

[30] *Emerson*, RANSOM LOOK (Oct. 18, 2025) https://www.ransomlook.io/screenshots/clop/EMERSONCOM%20-%20%28EBS%29.png; *Washington Post*, RANSOM LOOK (Nov. 6, 2025) https://www.ransomlook.io/screenshots/clop/WASHINGTONPOSTCOM.png; *Cox*, RANSOM LOOK (Oct. 10, 2025) https://www.ransomlook.io/screenshots/clop/COXENTERPRISESCOM.png.

**CL0P^_- LEAKS**

HOME   HOW TO DOWNLOAD?   ARCHIVE ⌄   ARCHIVE2 ⌄   ARCHIVE3 ⌄   ARCHIVE4 ⌄   ARCHIVE5 ⌄   ARCHIVE6 ⌄   ARCHIVE7 ⌄   ARCHIVE8 ⌄   ARCHIVE9 ⌄   ARCHIVE10 ⌄   HARVARD.EDU   WITS.AC.ZA   AA.COM   EMERSON.COM

**Headquarters:**

8000 W Florissant Ave, St. Louis, Missouri, 63136, United States

**Phone:**

(314) 553-2000

**Website:**

www.emerson.com

**Revenue:**

$17.8 Billion

**Industry:**

Business Services, Software, Manufacturing

**Warning:**

The company doesn't care about its customers, it ignored their security!!!

---

**CL0P^_- LEAKS**

HOME   HOW TO DOWNLOAD?   ARCHIVE ⌄   ARCHIVE2 ⌄   ARCHIVE3 ⌄   ARCHIVE4 ⌄   ARCHIVE5 ⌄   ARCHIVE6 ⌄   ARCHIVE7 ⌄   ARCHIVE8 ⌄   ARCHIVE9 ⌄   ARCHIVE10 ⌄   HARVARD.EDU   WITS.AC.ZA   AA.COM   EMERSON.COM   COPELAND.COM   MILGARD.COM   LKQCORP.COM   AUSENCO.COM   CSCGLOBAL.COM   SE.COM   HRSD.COM   COXENTERPRISES.COM   PANAMERICANSILVER.COM   DAVIDYURMAN.COM   MASTEC.COM   ANSELL.COM   LV.COM   RHEEM.COM   WOODPLC.COM   ELSEWEDYELECTRIC.COM   KIER.CO.UK   LOGITECH.COM   INFORMA.COM   INTERNATIONAL.COM   MKS.COM   TRIMBLE.COM   KIRBYCORP.COM   ZANACO.CO.ZM   WASHINGTONPOST.COM

**Headquarters:**

1 Franklin Sq, Washington, District of Columbia, United States

**Phone:**

(800) 477-4679

**Website:**

www.washingtonpost.com

**Revenue:**

$546.3 Million

**Industry:**

Media & Internet, Newspapers & News Services

**Warning:**

The company doesn't care about its customers, it ignored their security!!!



42. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in Defendants' custody and control. And upon information and belief, the putative class is over one hundred members—as it includes the current and former employees and/or customers of Defendants.[31]

43. And yet, despite the Data Breach having unfolded nearly a month ago, Defendants have made no effort whatsoever to notify the Class.

44. Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

45. Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the

---

[31] *Id.*

Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

46.    Defendants have done nothing to remedy their Data Breach.

47.    Because of Defendants' Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

48.    Still, despite this public evidence of broad misuse, Defendants have done nothing to remedy their Data Breach.

49.    Thus, on information and belief, Plaintiffs' and the Class's stolen PII has already been published—or will be published imminently—by CL0P on the Dark Web.

***Plaintiff Amber R. Woodson's Experiences and Injuries***

50.    Plaintiff Amber R. Woodson is a former employee of Defendant Emerson, and a Data Breach victim.

51.    Thus, Defendants Oracle and Emerson obtained and maintained Plaintiff's PII.

52.    As a result, Plaintiff was injured by Defendants' Data Breach.

53.    Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner.  She is careful to store any documents containing her PII in a secure location.

54.    As a condition of her employment with Defendant Emerson, Plaintiff provided Defendant Emerson with her PII. Defendant Emerson used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

55.    Plaintiff provided her PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

56.    Plaintiff reasonably understood that a portion of the funds derived from her employment would be used to pay for adequate cybersecurity and protection of PII.

57.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

58.    Through its Data Breach, Defendants compromised Plaintiff's PII.

59.    Plaintiff has spent—and will continue to spend—significant uncompensated time and effort monitoring her accounts to protect herself from identity theft.

60.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

61.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

62.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

63.    Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

64.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. PII is a form of intangible property—property that Defendants was required to adequately protect.

65.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

66.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

67.     Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Anthony Bryant's Experiences and Injuries***

68.     Plaintiff Anthony Bryant is an employee of Defendant Washington Post, and a Data Breach victim.

69.     Thus, Defendants Oracle and Washington Post obtained and maintained Plaintiff's PII.

70.     As a result, Plaintiff was injured by Defendants' Data Breach.

71.     Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner.  He is careful to store any documents containing his PII in a secure location.

72.     As a condition of his employment with Defendant Washington Post, Plaintiff provided Defendant Washington Post with his PII. Defendant Washington Post used that PII to

facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

73.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

74.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

75.    Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

76.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

77.    Through its Data Breach, Defendants compromised Plaintiff's PII.

78.    Plaintiff has *already* suffered from identity theft and fraud—whereby a hotline confirmed that his name and financial information were included in the breach, and he was notified in September that his Social Security number appeared on the Dark Web. He has spent substantial time addressing multiple fraudulent charges and replacing compromised cards. He has also received suspicious inquiries from individuals falsely claiming a relationship with him, indicating further misuse of his personal information.

79.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

80.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

81.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

82.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

83.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

84.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. PII is a form of intangible property—property that Defendants was required to adequately protect.

85.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

86.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of uncompensated time and money to try and mitigate his injuries.

87.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Austin Pool's Experiences and Injuries***

88.    Plaintiff Austin Pool was an employee of Defendant Emerson, and a Data Breach victim.

89.    Thus, Defendants Oracle and Emerson obtained and maintained Plaintiff's PII.

90.     As a result, Plaintiff was injured by Defendants' Data Breach.

91.     Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner.  He is careful to store any documents containing his PII in a secure location.

92.     As a condition of his employment with Defendant Emerson, Plaintiff provided Defendant Emerson with his PII. Defendant Emerson used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

93.     Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

94.     Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

95.     Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

96.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

97.     Through its Data Breach, Defendants compromised Plaintiff's PII.

98.     Plaintiff has spent—and will continue to spend—significant uncompensated time and effort monitoring his accounts to protect himself from identity theft.

99.     And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

100.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

101.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

102.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

103.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. PII is a form of intangible property—property that Defendants was required to adequately protect.

104.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

105.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

106.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Marc Culpepper's Experiences and Injuries***

107.    Plaintiff Marc Culpepper was an employee of Defendant Emerson, and a Data Breach victim.

108.    Thus, Defendants Oracle and Emerson obtained and maintained Plaintiff's PII.

109.    As a result, Plaintiff was injured by Defendants' Data Breach.

110.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner.  He is careful to store any documents containing his PII in a secure location.

111.    As a condition of his employment with Defendant Emerson, Plaintiff provided Defendant Emerson with his PII. Defendant Emerson used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

112.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

113.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

114.    Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

115.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

116.    Through its Data Breach, Defendants compromised Plaintiff's PII.

117.    Plaintiff has spent—and will continue to spend—significant uncompensated time and effort monitoring his accounts to protect himself from identity theft.

118.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

119.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

120.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

121.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

122.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. PII is a form of intangible property—property that Defendants was required to adequately protect.

123.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

124.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

125.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Plaintiff Marcus Issac's Experiences and Injuries***

126.    Plaintiff Marcus Issac was an employee of Defendant Cox, and a Data Breach victim.

127.    Thus, Defendants Oracle and Cox obtained and maintained Plaintiff's PII.

128.    As a result, Plaintiff was injured by Defendants' Data Breach.

129.    Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner.  He is careful to store any documents containing his PII in a secure location.

130.    As a condition of his employment with Defendant Cox, Plaintiff provided Defendant Cox with his PII. Defendant Cox used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

131.    Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

132.    Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

133.    Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

134.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

135.    Through its Data Breach, Defendants compromised Plaintiff's PII.

136.    Plaintiff has spent—and will continue to spend—significant uncompensated time and effort monitoring his accounts to protect himself from identity theft.

137.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

138.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

139.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

140.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

141.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. PII is a form of intangible property—property that Defendants was required to adequately protect.

142.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

143.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

144.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

*Consumers Prioritize Data Security*

145.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[32] Therein, Cisco reported the following:

a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[33]

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[34]

c.    89% of consumers stated that "I care about data privacy."[35]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[36]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[37]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[38]

---

[32] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, Cisco, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[33] *Id*. at 3.
[34] *Id*.
[35] *Id*. at 9.
[36] *Id*.
[37] *Id*.
[38] *Id*. at 11.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

146.    Because of Defendants' failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, uncompensated lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

> a.    loss of the opportunity to control how their PII is used;
>
> b.    diminution in value of their PII;
>
> c.    compromise and continuing publication of their PII;
>
> d.    out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;
>
> e.    lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;
>
> f.    delay in receipt of tax refund monies;
>
> g.    unauthorized use of their stolen PII; and
>
> h.    continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII.

147.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

148. The value of Plaintiffs and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

149. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

150. One way criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

151. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

152. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is traceable to the Data Breach.

153. Defendants disclosed the PII of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened, disclosed, and exposed the PII of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts,

and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

154.    Defendants' failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbates Plaintiffs and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

155.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

156.    In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[39]

157.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[40]

158.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

---

[39] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[40] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

*Defendants Failed to Follow FTC Guidelines*

159.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendants'—should use to protect against unlawful data exposure.

160.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[41]  The FTC declared that, *inter alia*, businesses must:

      a.      protect the personal customer information that they keep;

      b.      properly dispose of personal information that is no longer needed;

      c.      encrypt information stored on computer networks;

      d.      understand their network's vulnerabilities; and

      e.      implement policies to correct security problems.

161.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

162.    Furthermore, the FTC explains that companies must:

      a.      not maintain information longer than is needed to authorize a transaction;

      b.      limit access to sensitive data;

      c.      require complex passwords to be used on networks;

      d.      use industry-tested methods for security;

      e.      monitor for suspicious activity on the network; and

---

[41] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

f.     verify that third-party service providers use reasonable security measures.

163.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

*164.*    In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**Defendants Failed to Follow Industry Standards**

165.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants'. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

166.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

167.    Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of one or more of the

NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

168.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

169.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered in October 2025 that impacted Defendants.

170.    Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

171.    Plaintiffs reserve the right to amend the class definition.

172.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

173. <u>Ascertain ability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. Defendants employ or employed the Class Members and maintain detailed personnel records containing their identifying information.

174. <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the putative class consists of hundreds of members—as it includes their current and former employees/consumers.

175. <u>Typicality</u>. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and Defendants' complete failure to notify individuals of the Data Breach.

176. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Plaintiffs' interests do not conflict with Class Members' interests. And Plaintiffs have retained counsel—including lead counsel—that are experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

177. <u>Commonality and Predominance</u>. Plaintiffs' and the Class's claims raise common facts and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

  a.    if Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

  b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

  c.    if Defendants were negligent in maintaining, protecting, and securing PII;

> d.    if Defendants breached contract promises to safeguard Plaintiffs and the Class's PII;
>
> e.    if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;
>
> f.    if Defendants' Breach Notice was reasonable;
>
> g.    if the Data Breach caused Plaintiffs and the Class injuries;
>
> h.    what the proper damages measure is; and
>
> i.    if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

178.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

179.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

180.    Plaintiffs and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

181.    Defendants owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger occurred.

182.    Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII were wrongfully disclosed.

183.    Defendants owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. Defendants actively sought and obtained Plaintiffs and Class Members' PII.

184.    Defendants owed—to Plaintiffs and Class Members—at least the following duties to:

      a.    exercise reasonable care in handling and using the PII in their care and custody;

      b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

      c.    promptly detect attempts at unauthorized access;

      d.    notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

185.    Thus, Defendants owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

186.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII that it no longer required under applicable regulations.

187.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

188.    Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants, Plaintiffs, and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendants.

189.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

190.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

191.    Defendants improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

192.    Defendants breached these duties as evidenced by the Data Breach.

193.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a.    disclosing and providing access to this information to third parties and

b.    failing to properly supervise the way the PII was stored, used, and exchanged.

194.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

195.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

196.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

197.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

198.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and uncompensated lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

### SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiffs and the Class)

199.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

200.    Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

201.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs and the Class Members' sensitive PII.

202.    Defendants breached their respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

203.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and

amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

204.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

205.    But for Defendants' wrongful and negligent breach of their duties owed, Plaintiffs and Class Members would not have been injured.

206.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants failed to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

207.    Defendants' various violations and failure to comply with applicable laws and regulations constitutes negligence *per se*.

208.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class Members suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

209.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

210.    Plaintiffs and Class Members either directly contracted with Defendants or Plaintiffs and Class Members were the third-party beneficiaries of contracts with Defendant.

211.    Plaintiffs and Class Members (or their third-party agents) were required to provide their PII to Defendants as a condition of receiving employment provided by Cox, Emerson, and Washington Post. Plaintiffs and Class Members (or their third-party agents) provided their PII to Defendants or their third-party agents in exchange for employment.

212.    The contracts entered by Plaintiffs' and Class Members' agents (for example, their employers), were made for the direct benefit of Plaintiffs and the Class.

213.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

214.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

215.    Plaintiffs and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for employment.

216.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

217.    In their Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

218.    Implicit in the parties' agreement was that Defendants would provide Plaintiffs and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

219.    Plaintiffs and Class Members (or their third-party agents) would not have entrusted their PII to Defendants (or their third-party agents) in the absence of such an agreement with Defendants.

220.    Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendants.

221.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to their form.

222.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their condut to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

223.    Defendants materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agents) by:

      a.    failing to safeguard their information;

      b.    failing to notify them promptly of the intrusion into their computer systems that compromised such information.

      c.    failing to comply with industry standards;

      d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.      failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

224.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

225.    Defendants' material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

226.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

227.    Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

228.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

229.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

230.    Defendants owed a duty to their current and former employees, including Plaintiffs and the Class, to keep this information confidential.

231.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII is highly offensive to a reasonable person.

232.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be

kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

233.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

234.    Defendants acted with a knowing state of mind when it permitted the Data Breach because they knew their information security practices were inadequate.

235.    Defendants acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

236.    Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

237.    As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

238.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

239.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

240.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiffs and the Class.

241.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**<u>FIFTH CAUSE OF ACTION</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

242.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

243.    This claim is pleaded in the alternative to the breach of implied contract claim.

244.    Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon Defendants. Defendants benefitted from (1) using their PII to facilitate employment, and (2) using their labor to derive profit.

245.    Defendants appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members.

246.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

247.    Defendants enriched themselves by saving the costs they should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

248.    Instead of providing a reasonable level of security, or retention policies, which would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

249.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII; and (2) employment because Defendants failed to adequately protect their PII.

250.    Plaintiffs and Class Members have no adequate remedy at law.

251.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Class)**

252.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

253.    Given the relationship between Defendants, Plaintiffs, and Class Members, where Defendants became guardian of Plaintiffs' and Class Members' PII, Defendants became a fiduciary by their undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' PII; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

254.    Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

255.    Because of the highly sensitive nature of the PII, Plaintiffs and Class Members (or their third-party agents) would not have entrusted Defendants, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

256.    Defendants breached their fiduciary duties to Plaintiffs and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

257.    Defendants also breached their fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

258.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## **PRAYER FOR RELIEF**

Plaintiffs and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.    Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.    Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.


Dated: November 24, 2025          By:  */s/ Joe Kendall*
                                       Joe Kendall
                                       Texas Bar No. 11260700
                                       KENDALL LAW GROUP, PLLC
                                       3811 Turtle Creek Blvd., Suite 825
                                       Dallas, Texas 75219
                                       Telephone: 214/744-3000
                                       Facsimile: 214/744-3015
                                       jkendall@kendalllawgroup.com

                                       Raina C. Borrelli*
                                       Samuel J. Strauss*
                                       STRAUSS BORRELLI PLLC
                                       One Magnificent Mile
                                       980 N Michigan Avenue, Suite 1610
                                       Chicago IL, 60611
                                       Telephone: (872) 263-1100
                                       Facsimile: (872) 263-1109

raina@straussborrelli.com
sam@straussborrelli.com

*Pro hac vice* forthcoming

**Attorneys for Plaintiff and the Proposed Class**